In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 25-2349 & 25-2350

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANNE PRAMAGGIORE and MICHAEL F. MCCLAIN,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 20 CR 812-1 & -2 — **Manish S. Shah**, *Judge.*[†]

ARGUED APRIL 14, 2026 — DECIDED JUNE 15, 2026

Before HAMILTON, KIRSCH, and KOLAR, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Anne Pramaggiore and Michael F.
McClain—the Chief Executive Officer and a lobbyist for the
Commonwealth Edison Company, respectively—along with

---

[†] Judge Harry D. Leinenweber had responsibility for these cases, in-
cluding presiding over the 2023 trial, until his passing in 2024.

two others, were convicted by a jury of a series of crimes involving transactions with the Speaker of the Illinois House of Representatives, Michael Madigan, and his associates. The crimes included criminal conspiracy in violation of 18 U.S.C. §§ 371 & 2; offering and agreeing to give things of value, and causing ComEd to do the same, for the benefit of Madigan in violation of 18 U.S.C. §§ 666 & 2; and falsifying books and records to conceal payments made for Madigan's benefit in violation of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78m(b)(5) & 78ff(a), as well as 18 U.S.C. § 2. As charged, the conspiracy had four objects: the indictment alleged that Pramaggiore and McClain conspired to corruptly solicit and demand things of value; corruptly give and offer to give things of value; falsify books, records, or accounts; and circumvent a system of internal accounting controls. In line with our case law at the time of trial, the government proceeded on a theory that § 666 extended beyond quid pro quo bribery of state officials to include giving or receiving illegal gratuities, and the jury was instructed accordingly. Pramaggiore and McClain were convicted on all counts.

Afterward, the Supreme Court decided *Snyder v. United States*, 603 U.S. 1 (2024), which resolved a circuit split and limited the application of § 666 to quid pro quo bribery by holding that the statute did not prohibit gratuities paid to state or local officials. *Id.* at 19–20. Based on that decision, the district court correctly vacated the substantive § 666 convictions. The government then dismissed those charges, so they are not before us.

As to the conspiracy, the district court correctly concluded there was error under *Snyder*, as the objects relating to § 666 were no longer a valid basis for the conspiracy convictions

without a finding of an agreement for quid pro quo bribery. But it then held that the error was harmless because there was sufficient evidence for the jury to have found an illegal conspiracy based on either of the two remaining objects—that Pramaggiore and McClain conspired to falsify books, records, or accounts or circumvent a system of internal accounting controls.

Although the government presented significant and compelling evidence, the pre-*Snyder* jury instructions mean the conspiracy convictions cannot survive *Snyder*. Everyone agrees that two of the four objects of the conspiracy are legally invalid. The question we are called upon to answer is whether the other two remaining objects are enough to sustain the conspiracy convictions. They are not. As in *Skilling v. United States*, 561 U.S. 358 (2010), the legally invalid objects presented to the jury created legal error. And that error was not harmless. We do not know on which of the four objects of the conspiracy the jury convicted Pramaggiore and McClain, and it is not beyond a reasonable doubt that the jury convicted them on one of the valid grounds. In that way, the invalid objects infected the conspiracy convictions, so we are compelled to vacate them.

The Foreign Corrupt Practices Act convictions fail for a similar reason. The government presented its case in part under a theory of liability through which a defendant can be found guilty of the substantive crimes his co-conspirators committed that were reasonably foreseeable to him and taken in furtherance of the conspiracy. See *Pinkerton v. United States*, 328 U.S. 640 (1946). As a result, the jury might have convicted Pramaggiore or McClain of the books and records charges by finding that a co-conspirator committed the crimes, which

were reasonably foreseeable to Pramaggiore and McClain and in furtherance of the conspiracy. Since we don't know that the jury found that the defendants entered into an illegal conspiracy, we must vacate the FCPA convictions as well.

Pramaggiore and McClain, however, are not entitled to judgments of acquittal. And, as we explain below, we disagree with their contention that no one could say that their documents were falsified. So, the government is entitled to retry them at its discretion on the conspiracy and FCPA charges without the invalid legal theories.

I

Because the defendants were convicted at trial, we summarize the facts in the light most favorable to the government. See *Cavazos v. Smith*, 565 U.S. 1, 7 (2011). A short summary will do, and, of course, the government will need to establish the facts anew should it choose to try this case again. See *Burks v. United States*, 437 U.S. 1, 15 (1978).

In 2012, Anne Pramaggiore became the Chief Executive Officer of Commonwealth Edison Company (ComEd). ComEd supplies electricity to customers in Illinois. In 2018, Pramaggiore was promoted to CEO of Exelon Corporation (Exelon), ComEd's parent company and a multi-state utility services holding company. Michael F. McClain served as an Illinois state representative from 1973 to 1983 and was later employed by ComEd as a lobbyist between 1985 and 2019. McClain was the connection between ComEd and Madigan, with Madigan assigning McClain tasks and sending messages through him. Witnesses called McClain a puppet master serving on Madigan's behalf, as well as a double agent, because it

was unclear whether he was representing the interests of ComEd or Madigan.

Over the years, Pramaggiore and McClain engaged in a series of transactions involving Madigan and his associates. For instance, they set up a subcontractor scheme where they added Madigan's associates to ComEd's existing consulting and lobbying contracts without reporting the changes to the contracts. Many of the contracts were no-show contracts, meaning they were for services that were not actually rendered. Indeed, when one contractor told Madigan that he hadn't been given any work from ComEd, Madigan told the contractor that the structure was what he and ComEd sought. Over eight years, ComEd and Exelon paid over $1.3 million to Madigan's associates. At the same time, Pramaggiore and McClain sought the passage of legislation favorable to ComEd and the defeat of legislation unfavorable to it. At one point, McClain, while worrying that Pramaggiore's replacement as ComEd's CEO would think that there was "a quid pro quo" arrangement between the company and Madigan, said that "if you want to pass this bill, this is what it requires."

Exelon and ComEd were required by law to maintain a system of internal controls, including controls for financial reporting and legal and regulatory compliance. And Exelon's Code of Business Conduct mandated employees and contractors to make accurate and complete financial records. Exelon also required that a manager, supervisor, or executive, such as Pramaggiore, approve consulting or lobbying contracts. The government argues that Pramaggiore and McClain falsified books and records in violation of these requirements and the FCPA. Some of the books and records at issue are the contracts with Jay D. Doherty and his firm, Jay D. Doherty &

Associates (JDDA), which ComEd used to manage lobbyists. The government maintains that the contracts with JDDA were falsified because they provided only single-source justifications that left out who was doing the work and what work was being done, or otherwise simply lied about the work being done. For instance, an amendment to a contract with JDDA called for the payment of an additional $5,000 to a contractor supposedly based on an "expanded role with [the] Cook County Board President's office and Cook County Commissioners and Department Heads," but the contractor didn't do any work at all. And where JDDA invoice amounts increased because the contract added new subcontractors to it, the invoices didn't mention those subcontractors. Further, with Doherty, the contracts (and their amendments) were supposedly falsified because, though they were entered so that ComEd could benefit from Doherty's "unique insight & perspective" and to obtain him as an advisor, many of the payments went to subcontractors that were not listed on the contracts and were for work not described in the contracts or not actually performed at all.

The jury convicted Pramaggiore and McClain on all nine counts: one count of conspiracy in violation of 18 U.S.C. §§ 371 & 2; four counts of corruptly offering and agreeing to give a thing of value—and causing ComEd to do the same—for the benefit of Madigan in violation of 18 U.S.C. §§ 666(a)(2) & 2; and four counts of knowingly and willfully causing certain books, records, and accounts to be falsified in violation of 15 U.S.C. §§ 78m(b)(5) & 78ff(a), as well as of 18 U.S.C. § 2. Each conviction was based on a general, rather than a special, verdict. After the verdict, Pramaggiore and McClain moved for a judgment of acquittal under Federal Rule of Criminal

Procedure 29 and a new trial under Federal Rule of Criminal Procedure 33. The district court denied both motions.

After the denial of these motions, the Supreme Court decided *Snyder v. United States* and then *Thompson v. United States*, 604 U.S. 408 (2025). In *Snyder*, the Court resolved a circuit split and overturned our precedent that § 666 criminalized illegal gratuities as well as quid pro quo bribery, ruling that § 666 only punished quid pro quo bribery. See 603 U.S. at 19. Because the jury instructions did not require the jury to find quid pro quo bribery to convict Pramaggiore and McClain on the § 666 charges, Pramaggiore and McClain filed a joint motion asking the district court to reconsider the denial of their post-trial motions. The district court held a hearing and vacated their § 666 convictions.

In *Thompson*, the Court held that in the context of 18 U.S.C. § 1014 (a statute not at issue here), false did not include misleading. 604 U.S. at 417. Because Pramaggiore and McClain had been convicted of falsifying books and records in the context of 15 U.S.C. § 78m(b)(5), they argued in another joint motion for reconsideration that *Thompson* changed the meaning of falsifying to exclude misleading statements. They then said that the books were at best made misleading, not false. But the district court denied their motion. Pramaggiore and McClain now appeal what is left of their conspiracy convictions and their FCPA convictions, seeking judgments of acquittal, or, in the alternative, a new trial.

## II

We first consider Pramaggiore and McClain's challenge to the conspiracy convictions. Pramaggiore and McClain contend that *Snyder* gave rise to a legal error that requires us to

vacate their conspiracy convictions. We review questions of law de novo. *Shango v. Jurich*, 965 F.2d 289, 291 (7th Cir. 1992).

## A

A conviction must be set aside when the jury may have relied on an invalid legal theory in reaching its verdict unless we can determine that the jury's potential reliance on the invalid legal theory was harmless. This rule is derived from a series of Supreme Court decisions beginning with *Stromberg v. California*, 283 U.S. 359 (1931). In that case, an individual was convicted of displaying a communist flag in a public space in violation of a California statute that prohibited doing so "as a sign, symbol or emblem of opposition to organized government or as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character." *Id.* at 361. Thus, the statute had three provisions, but because the verdict was general, the trial court couldn't know of which provision the jury had convicted the defendant. *Id.* at 367–69. The state appellate court doubted the constitutionality of the first part of the law but nonetheless upheld the conviction. *Id.* at 367. It separated the two valid clauses from the third arguably unconstitutional one and found that those valid clauses could justify the conviction. *Id.* The Supreme Court reversed, clarifying that if any of the clauses that could have been used by the jury in issuing its guilty verdict were "invalid under the Federal Constitution, the conviction cannot be upheld." *Id.* at 368. The Court then found the part of the state statute that prohibited flying flags as a sign, symbol, or emblem of opposition to organized government to be unconstitutional and set aside the conviction. *Id.* at 369–70. The Court did not consider whether the error was harmless because constitutional errors were not reviewed for

harmlessness until 1967. See *Chapman v. California*, 386 U.S. 18, 22–24 (1967) (holding that constitutional errors can be harmless).

In *Yates v. United States*, 354 U.S. 298 (1957), the Supreme Court extended *Stromberg*'s reasoning to legally flawed, but not otherwise unconstitutional, theories of guilt. *Id.* at 312; see *Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008) (per curiam) (explaining that *Yates* extended *Stromberg*). The Court wrote that a conviction must "be set aside," when it "is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates*, 354 U.S. at 312.

As the Supreme Court explained in *Skilling v. United States*, 561 U.S. 358 (2010), the *Yates* rule flows from constitutional guarantees. *Id.* at 414. These guarantees center on and are derived from the right to a jury determination of guilt beyond a reasonable doubt. "The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action … it requires an actual jury finding of guilty." *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993). And jury instructions relieving the government of the burden to prove beyond a reasonable doubt every element of the charged offense violate Due Process rights. See *Carella v. California*, 491 U.S. 263, 265 (1989) (per curiam) (citation modified). So, when the verdict may have rested on a legally insufficient ground, there is constitutional error. See *Skilling*, 561 U.S. at 414.

In *Hedgpeth*, the Court applied the harmless error analysis from *Chapman* to *Yates* errors. 555 U.S. at 62; see *Skilling*, 561 U.S. at 414 & n.46 (clarifying that *Hedgpeth* applies to cases on direct appeal in addition to those on collateral review). An error is harmless "if the prosecution can prove beyond a

reasonable doubt that a constitutional error did not contribute to the verdict." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988).

B

With this history in mind, we agree with the district court that there was legal error. The indictment charged four objects of the conspiracy: corruptly soliciting and demanding things of value in violation of § 666(a)(1)(B); corruptly giving and offering to give things of value in violation of § 666(a)(2); falsifying books, records, or accounts in violation of §§ 78m(b)(5) & 78ff(a); and circumventing a system of internal accounting controls in violation of those same statutes. There is no question that after *Snyder*, the two § 666 objects are legally invalid given the way the jury was instructed. Those legally invalid objects of the conspiracy resulted in legal error, just like in *Skilling*.

In *Skilling*, the defendants were charged with a multi-object conspiracy in violation of § 371: honest-services wire fraud in violation of 18 U.S.C. §§ 1343 & 1346, money or property wire fraud in violation of 18 U.S.C. § 1343, and securities fraud. 561 U.S. at 367, 414. The jury returned a general verdict finding the defendants guilty of conspiracy with no indication as to which object or objects the jury unanimously agreed. *Id.* at 375, 414. On appeal, the Supreme Court determined that the § 1346 honest services fraud theory was legally invalid. *Id.* at 411–13. This created a type of *Yates* error we sometimes call a *Skilling* error: the jury convicted a defendant of a conspiracy that had both valid and invalid objects. *Id.* at 414. Therefore, the convictions could not survive unless the error was harmless. *Id.* The Court did not reach the question of harmless error and instead remanded for resolution of that question. *Id.* On remand, the Fifth Circuit found that the error was harmless

beyond a reasonable doubt and affirmed the convictions. *United States v. Skilling*, 638 F.3d 480, 488 (5th Cir. 2011).

Here, the jury had the option of convicting Pramaggiore and McClain for conspiring to violate §§ 666(a)(1)(B) and/or (a)(2), and perhaps it did. But the § 666 objects were invalidated by *Snyder*, so Pramaggiore and McClain's conspiracy convictions are flawed, because with only a general verdict, we are unsure what the jury's determination rested upon.

Having found error, we now consider whether the error was harmless. It was not. The test is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (citation modified). The application of that test has created some uncertainty among the circuits. See *United States v. McKye*, 734 F.3d 1104, 1113 (10th Cir. 2013) (Briscoe, J., concurring) (circuits hold the government to different burdens); see also *Skilling*, 638 F.3d at 481 (noting on remand that the Supreme Court "did not specifically identify the harmless-error standard that is applicable to alternative-theory errors").

In this context, our circuit precedent states that the inquiry to establish harmlessness is "whether the trial evidence was such that the jury must have convicted the petitioners on both [the valid and invalid] theories." *Sorich v. United States*, 709 F.3d 670, 674 (7th Cir. 2013). Otherwise, as we said in *United States v. Borrero*, 771 F.3d 973 (7th Cir. 2014), "when the instructions allow a jury to convict on two theories, one of which is *legally* insufficient, then the court must remand for a new trial, because a jury that followed its instructions might have convicted on the invalid ground while disdaining the proper one." *Id.* at 976–77.

In *Turner v. United States*, 693 F.3d 756 (7th Cir. 2012), we explained one way in which such an error might be harmless. There, the jury considered two theories of fraud: honest-services fraud and pecuniary fraud. *Id.* at 757. We held that the evidence supporting the valid and invalid theories was "so thoroughly coextensive," that the convictions were "all or nothing." *Id.* at 759. So, when the honest-services fraud theory was declared invalid, the court found the error was harmless, because the jury must have convicted on the valid pecuniary theory as well. *Id.* at 757, 759–60. In other words, we knew that the error was harmless because the jury's guilty finding of the first crime necessarily meant that it made the factual findings sufficient to convict the defendants of the second. See also *United States v. Segal*, 644 F.3d 364, 366–67 (7th Cir. 2011) (finding a *Skilling* error to be harmless because even if the jury convicted based on an invalid theory, the conviction could stand because it must have been "premised on" another valid theory of fraud).

These cases show that our inquiry is not about weighing the evidence; it is about determining what the jury did. And if we "just don't know" what the jury relied upon, "that makes it impossible for us to evaluate the sufficiency of the evidence, because the jury rather than the judge decides which evidence to believe." *Borrero*, 771 F.3d at 976; see *Sullivan*, 508 U.S. at 279 ("[T]o hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.").

Not all circuits agree with our approach to determining harmless error. For instance, in the Fifth Circuit, the inquiry is "whether the record contains evidence that could rationally

lead to an acquittal with respect to the valid theory of guilt." *Skilling*, 638 F.3d at 482 (citation modified). And in the Third Circuit, if there is "overwhelming" evidence for the remaining valid theory of conviction, an error can still be considered harmless. *United States v. Wright*, 665 F.3d 560, 571 (3d Cir. 2012).

But we are not alone. The Tenth Circuit has decided that an alternative theory cannot sustain a verdict that could have rested on a legally invalid ground "unless it is possible to determine the verdict rested on the valid ground." *McKye*, 734 F.3d at 1110 & n.6 (citing *United States v. Holly*, 488 F.3d 1298, 1305 (10th Cir. 2007)). And in the Fourth Circuit, only "if the evidence that the jury necessarily credited in order to convict the defendant under the instructions given is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground," may the conviction be affirmed. *Bereano v. United States*, 706 F.3d 568, 578 (4th Cir. 2013) (quoting *United States v. Jefferson*, 674 F.3d 332, 361 (4th Cir. 2012)) (citation modified).

The government did not ask us to reconsider our approach, so we have no reason to do so. See *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam) ("[T]he rule that points not argued will not be considered distinguishes our adversarial system of justice from an inquisitorial one.") (citation modified). And this case is unlike *Turner*, because the evidence to prove a conspiracy to bribe is not coextensive with that required to prove a conspiracy to violate the FCPA. See 693 F.3d at 759. The government's harmlessness arguments, at bottom, amount only to a weak attempt to say that out-of-circuit case law compels another

result. Even if the other circuits are correct, the government never asked us to take the necessary step of overturning our own law to align ourselves with some of our sister circuits, so we will not do so.

On this record, we are compelled to vacate. The jury gave only a general verdict, the objects of the conspiracy were not overlapping, and the evidence was not coextensive. The jury could have reasonably agreed that there was a conspiracy to pay gratuities and then ended its discussion without ever considering whether there was an agreement to violate the FCPA. Perhaps the district court was correct that "no jury on this record would have or could have concluded otherwise." We need not comment on that determination, because Pramaggiore and McClain have the right to a jury verdict, and we do not know what the jury did.

## III

The analysis for the FCPA convictions yields the same result: vacatur, with the possibility for a new trial. Pramaggiore and McClain make two arguments: first, that the *Snyder* problem infected the FCPA convictions; and second, that *Thompson* entitled them to acquittal.

## A

We first consider whether we must vacate the substantive FCPA convictions because the government sought and received a *Pinkerton* instruction that permitted the jury to convict Pramaggiore and McClain of those violations so long as they were co-conspirators in furtherance of a valid conspiracy. See 328 U.S. at 646–80. The problem with these convictions is that to succeed on a *Pinkerton* theory of liability, "it is of course necessary to show that a conspiracy existed." *United*

*States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000). But as we explained, the government did not necessarily prove a valid conspiracy. Therefore, the jury was presented with legal alternatives for FCPA convictions (either Pramaggiore and McClain violated the FCPA or their co-conspirators did so in furtherance of a conspiracy), one of which was invalid. That constitutes error. See *Yates*, 354 U.S. at 312.

The error was not harmless. As the government conceded at oral argument, we do not know what the jury did. Even if it is unlikely that the jury convicted Pramaggiore and McClain of the FCPA records violations only on a *Pinkerton* theory that rested on a conspiracy grounded only on an invalid object, it is still possible that it did. We are compelled to vacate the FCPA convictions. *Borrero*, 771 F.3d at 977.

B

Pramaggiore and McClain next argue that vacatur does not go far enough, because after *Thompson*, they are entitled to acquittal on the conspiracy and FCPA counts since the books and records are not false. In *Thompson*, the Supreme Court dealt with 18 U.S.C. § 1014, which in relevant part "criminalizes knowingly making any false statement or report" for the purpose of influencing certain loan decisions. 604 U.S. at 413 (citation modified); 18 U.S.C. § 1014. The Court concluded that the statute "does not criminalize statements that are misleading but true." *Thompson*, 604 U.S. at 418. Rather, the statements "must be false." *Id.* (citation modified). Pramaggiore and McClain say that after *Thompson*, the books and records are not false because "falsify" under § 78m(b)(5) cannot include creating misleading documents or those with omissions, and the documents were not otherwise false.

Even if Pramaggiore and McClain are correct about the meaning of falsify after *Thompson*, the jury instructions—to which the parties agreed—required the jury to find that Pramaggiore and McClain falsified books, records, or accounts. Nowhere did the instructions suggest that the books and records could be misleading, rather than false. And indeed, Pramaggiore and McClain do not argue that the jury was improperly instructed, and we presume that juries follow instructions. *United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019). So, we only look at whether the record lacks evidence to have found them guilty beyond a reasonable doubt. *United States v. Corrigan*, 912 F.3d 422, 429 (7th Cir. 2019). There was more than sufficient evidence for the jury to have determined that the defendants made false records regarding these contracts. Therefore, Pramaggiore and McClain are not entitled to a judgment of acquittal.

Do not misread our opinion. We are not suggesting that Pramaggiore and McClain are innocent, only that their convictions were flawed and that they have a right to see their sentences vacated. Yet because "[a] properly instructed jury could have convicted the defendants on this record," a new trial is not foreclosed, "if the prosecutor chooses to press on." *Borrero*, 771 F.3d at 977; see *Burks v. United States*, 437 U.S. 1, 14 (1978).

VACATED AND REMANDED